*792
 
 OPINION OF THE COURT
 

 Rosenblatt, J.
 

 In the case before us, the tenant-operator of a supermarket granted its landlbrds a security interest in connection with its lease of the premises. A fire consumed the supermarket, destroying the collateral. The insurance carrier paid the loss proceeds directly to the tenant, who was its policyholder and the only loss payee named in the policy.
 

 The landlords have sued the carrier, claiming that the carrier should have given the loss proceeds to them (as security interest holders), rather than to the tenant. We must determine whether the carrier, by paying the fire loss proceeds to its policyholder, is thereby rendered liable in conversion to the policyholder’s landlords who had filed UCC-1 financing statements that covered the destroyed collateral.
 

 Pursuant to a security agreement, 75-27 B & F Supermarket, Inc. granted a security interest in favor of plaintiffs Elpidio and Irma Badillo in all “personal property, goods & chattels now present or after acquired * * * [and] all insurance proceeds & leasehold at [the supermarket] located at 75-27 Parsons Blvd., Flushing, N. Y.” The purpose was to secure B & F’s obligations as tenant, to the Badillos as landlords, in connection with the lease. The Badillos filed UCC-1 financing statements describing the secured collateral.
 

 Less than one year later, a fire destroyed the supermarket. At the time of the loss, B & F carried casualty insurance on the premises under a policy issued by defendant Tower Insur
 
 *793
 
 anee Company of New York. Nowhere in the policy were the Badillos named or their interest mentioned. B & F submitted a proof of loss to Tower, and eight days later Tower paid the loss proceeds to the policy limit, approximately $70,000, directly to B & F.
 
 [1]
 
 Approximately four months after Tower paid B & F — a year after the fire — the Badillos notified Tower of their security interest in the insurance proceeds and asked Tower whether it had issued any policies covering the premises. Upon learning that Tower had issued a policy and had already paid out on the claim, the Badillos sued Tower for the $70,000, alleging that Tower converted the money by paying it to B & F.
 

 Supreme Court denied Tower’s motion to dismiss the complaint for failure to state a cause of action. The Appellate Division affirmed (228 AD2d 239). Supreme Court later denied the Badillos’ motion for summary judgment against Tower. The Appellate Division reversed and granted summary judgment to the Badillos (243 AD2d 413). It held Tower liable to the Badillos based on the UCC-1 financing statements which, it ruled, gave Tower constructive notice of the Badillos’ security interest in the loss proceeds. While we agree with the courts below that the complaint was sufficient to withstand a CPLR 3211 motion to dismiss, we otherwise reverse.
 

 This case presents the corollary to this Court’s decision in
 
 Rosario-Paolo, Inc. v C & M Pizza Rest.
 
 (84 NY2d 379). In
 
 Rosario-Paolo,
 
 the Court held an insurance carrier liable to a third party who had an equitable interest in loss proceeds that were paid directly to an insured. In that case, however, the third party had provided the carrier with actual notice of its interest, by making a written claim against the loss proceeds before they were paid out
 
 (supra,
 
 at 382-384). Given this actual notice, the carrier in
 
 Rosario-Paolo
 
 had a duty to preserve the proceeds, by interpleader or some comparable means, until the issue of ownership could be resolved
 
 (supra,
 
 at 384;
 
 see also,
 
 4 Couch, Insurance 3d § 61:11, at 61-22 to 61-23 [1996]). The case before us is different, and points up the distinction between actual notice on the one hand, and information that may, on the other hand, be uncovered by a UCC-1 search.
 

 The insurance contract here was between B & F and Tower only. By its terms, Tower was obligated to pay the loss proceeds to B & F and no one else. We hold that the Badillos’ UCC-1 filing, without more, did not alter Tower’s obligation to pay the proceeds to its insured, B & F.
 

 
 *794
 
 UCC article 9 sets out a comprehensive scheme to regulate security interests in personal property. It establishes a system that enables creditors to protect their interests in collateral often held by debtors or other third parties. The article includes a notice-filing concept (see, UCC 9-401 to 9-410) by which, as a matter of public record, personal property is declared encumbered. Secured creditors may avail themselves of the protections afforded in article 9 by filing UCC-1 financing statements (see, UCC 9-402) in prescribed repositories (see, UCC 9-401). The filings serve to warn others, such as potential purchasers, transferees, or other creditors, of encumbrances. In that manner, creditors gain protection, as do others who choose to do business with debtors.
 

 The UCC also protects the rights of a secured creditor by according it an interest in property that the debtor receives as
 
 replacement
 
 for the encumbered property
 
 (see generally,
 
 Bowmar, Secured Transactions in New York § 9.1 [1991]). Thus, as relevant here, UCC 9-306 (2) provides that
 
 “a
 
 security interest * * * continues in any identifiable proceeds including collec-. tions received by the debtor.” UCC 9-306 (1) had previously defined “proceeds” to include “whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of.” A 1977 amendment to UCC 9-306 (1) (L 1977, ch 866, § 19) expanded the definition of proceeds to include “[insurance payable by reason of loss or damage to * * * collateral * * *, except to the extent that it is payable to a person other than a party to the security agreement.” The Badillos argue that this expanded definition obligated Tower to notify them of the loss on the strength of their UCC-1 financing statements.
 
 [2]
 
 The 1977 amendment, howéver, does not create an obligation on the part of an insurance carrier to undertake UCC-1 searches for third parties, unnamed in the policy, who might have an interest in the covered property. The amendment merely broadens the definition of “proceeds” to include loss proceeds from insurance policies, thereby allowing a creditor’s security interest in collateral to attach automatically to insurance proceeds received by the debtor. The amendment affects only the rights between the debtor and the creditor, so that when the debtor gets the insurance proceeds, the creditor, as a
 
 *795
 
 secured party, can look to those proceeds in place of the destroyed collateral. There is nothing in UCC 9-306 (1) that creates rights between the creditor and the insurance carrier absent actual notice to the carrier, as in
 
 Rosario-Paolo.
 

 The policy behind the constructive notice provided by UCC-1 financing statements is not applicable to carriers in the context of good faith payment of loss proceeds under insurance contracts. There is nothing in the language of the statute, its history, its usage, or its application that suggests otherwise
 
 (cf.,
 
 UCC 9-303, Comment 1, reprinted in McKinney’s Cons Laws of NY, Book 621/2 [1990] [“A perfected security interest may still be or become subordinate to other interests * * * but in general after perfection the secured party is protected against creditors and transferees of the debtor and in particular against any representative of creditors in insolvency proceedings instituted by or against the debtor”]). In relation to its policyholder, an insurance carrier, which pays loss proceeds to the proper recipient under a policy, is more like an account debtor who is protected under UCC 9-318 (3) when it makes payment without actual notice “that the amount due or to become due has been assigned and that payment is to be made to the assignee”
 
 (see, Matter of Chase Manhattan Bank v State of New York,
 
 40 NY2d 590, 594;
 
 see also,
 
 Clark, The Law of Secured Transactions under the Uniform Commercial Code, 1998 Supp No. 3, H 10.01 [2] [g] [rev ed]).
 

 The Badillos’ interpretation of UCC 9-306 (1) would complicate and delay the payment of claims. Before carriers could safely make loss payments, they would need to perform UCC searches that may involve multiple parties, multiple interests, and the prospect of investigating and evaluating the efficacy of particular filings, in various jurisdictions. For fear of having to pay twice, carriers would be discouraged from paying claims promptly, and the claims process would be disrupted
 
 (see,
 
 Clark, The Law of Secured Transactions under the Uniform Commercial Code,
 
 op. cit.).
 

 The existence or non-existence of a duly prepared and filed UCC-1 financing statement seems easily discernible, and usually is, but given the alternatives, there is no need to subject the insurance claims process to the vagaries surrounding the adequacy of UCC-1 filings, which are often enough the subject of protracted litigation
 
 (see, e.g., Reisdorf Bros. v Clinton Corn Processing Co.,
 
 130 AD2d 951 [misspelling of the debtor’s name on UCC-1 financing statement rendered creditor’s security interest unperfected];
 
 compare, John Deere Co. v Richards,
 
 136
 
 *796
 
 Misc 2d 923, 924 [incorrect serial number in description of collateral on UCC-1 financing statement prohibited creditor from seizing chattel],
 
 with Breiter & Co. v Domler Leasing Corp.,
 
 1976 WL 23691, 19 UCC Rep Serv [CBC] 1248 [NY Sup Ct 1976] [incorrect serial number in description of collateral on UCC-1 financing statement did not render security interest unperfected];
 
 see generally,
 
 Carroll and Harrell,
 
 Article 9 Filings: Russian Roulette-UCC Style,
 
 52 Consumer Fin LQ Rep 338 [1998]). There is a much simpler road to travel. The secured party always has the conventional option of having itself named in the insurance contract as the loss payee or as an additional insured on the risk.
 

 Accordingly the judgment of Supreme Court appealed from, which brings up for review orders of the Appellate Division, should be reversed, with costs, and plaintiffs’ motion for summary judgment should be denied.
 

 Chief Judge Kaye and Judges Bellacosa, Smith, Ciparick and Wesley concur; Judge Levine taking no part.
 

 Judgment of Supreme Court appealed from, bringing up for review orders of the Appellate Division, reversed, etc.
 

 [1]
 

 . B & F did not turn over any of the proceeds to the Badillos. Apparently • B & F is defunct.
 

 [2]
 

 . In this respect they rely on this Court’s decision in
 
 First Natl. Bank v Merchants Mut. Ins. Co.
 
 in which the Court reversed “for the reasons stated” in the Appellate Division dissent (49 NY2d 725, 726,
 
 revg
 
 65 AD2d 59, 61-62). The dissenters observed that the 1977 amendment was not effective at the relevant time. This was the basis upon which our reversal rested.